IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs October 29, 2019

**RODNEY JENNINGS v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Hamilton County**
**No. 305431   Thomas C. Greenholtz, Judge**

————————————————————

**No. E2019-00343-CCA-R3-PC**

————————————————————

The petitioner, Rodney Jennings, appeals the denial of his post-conviction petition, arguing the post-conviction court erred in finding he received the effective assistance of counsel at trial.  Following our review, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J. and D. KELLY THOMAS, JR., J., joined.

Rodney Jennings, Wartburg, Tennessee, Pro Se.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Assistant Attorney General; Neal Pinkston, District Attorney General; and Cameron Williams, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Facts and Procedural History*

After a Hamilton County jury convicted the petitioner of second degree murder, the trial court imposed a sentence of twenty-five years to be served in the Tennessee Department of Correction.[1]   The petitioner appealed his conviction, challenging the sufficiency of the evidence supporting the same, several of the trial court's evidentiary rulings, and the manner in which the State impeached the petitioner during cross-

---

[1] The petitioner was also originally indicted for possession of a firearm with a violent felony conviction which the trial court dismissed at the State's request. *State v. Rodney Jennings*, No. E2017-00330-CCA-R3-CD, 2018 WL 1168723, at *12 (Tenn. Crim. App. Mar. 6, 2018), *perm. app. denied* (June 6, 2018).

examination. In denying relief, this Court provided a thorough recitation of the evidence presented at trial:[2]

This case arises from a domestic dispute over visitation with the [petitioner] and Cheslei Thompson's children, which resulted in the [petitioner] shooting and killing Ms. Thompson's cousin, Raphael White. A grand jury indicted the [petitioner] for second degree murder and possession of a firearm with a violent felony conviction. One of the issues the [petitioner] raises on appeal[] is the admission of testimony about a 2013 domestic assault. As such, we separately summarize the testimony from the 404(b) hearing before providing the summary of the trial testimony.

**A. 404(b) Hearing**

The State sought to introduce proof of a June 2013 domestic assault conviction, involving Ms. Thompson and the [petitioner's] children. The State submitted that the evidence was relevant to show the [petitioner's] intent related to the second degree murder charge, demonstrating similarities between the 2013 episode and the 2014 shooting. The State, through Jean Rogers, a Hamilton County 911 Record Specialist, introduced two 911 calls made from a neighbor's residence recorded at 1:11 a.m. on June 5, 2013. The defense, through the same witness, introduced two 911 calls placed from Waffle House on East 23rd Street. These calls were made by a man who identified himself as "Rodney" at 4:22 a.m. and 5:02 a.m. on June 5, 2013.

Brian Angel, a Chattanooga Police Department officer, testified that, in June 2013, he was dispatched to a residence on 6th Avenue in Chattanooga, Tennessee, at approximately 1:30 a.m. When he arrived, he observed a female, Ms. Thompson, outside who appeared "very hysterical." There was blood "all over her," and he noticed a broken window on the front of the apartment. Ms. Thompson explained to the officer that her "child's father," later identified as the [petitioner], had broken the window and there was "some kind of struggle" during which she was cut on the broken glass. The [petitioner] made entry but fled prior to the officer's arrival. Officer Angel testified that Ms. Thompson had cuts on her forearms. He also observed two small children inside the residence.

---

[2] As noted, the proof presented at trial and this Court's summary of the same was extensive. Thus, we have only included the portions of our prior summary which are relevant to the issues on appeal.

Officer Angel testified that, within a couple hours of his initial contact with Ms. Thompson, the [petitioner] arranged to turn himself in to the police at a Waffle House parking lot located on 23rd Street. On cross-examination, Officer Angel was asked about whether there was "a lot of gang activity" in the 6th Avenue apartment complex, and he replied, "Sure."

Ms. Thompson testified that she and the [petitioner] had been in a relationship and had two children together. The couple had never married but had lived together intermittently. Ms. Thompson explained that the [petitioner] lived with her at the 6th Avenue residence for "a couple of months" before he moved out due to an argument. In June 2013, after the [petitioner] had moved out, he returned to "visit." During the visit, a Chattanooga Housing Authority employee appeared at the residence and issued the [petitioner] a citation for "yelling in [Ms. Thompson's] face" and banned the [petitioner] from the property.

Ms. Thompson testified that several days later, on June 5, 2013, a friend of hers was spending the night. She recalled that Kionna Glenn and Ms. Thompson's two children were at the residence that night when the [petitioner] came to the door. Ms. Glenn let the [petitioner] inside and, once inside, he instigated an argument with Ms. Thompson. The [petitioner] and Ms. Thompson were in an upstairs bedroom with their children, and the [petitioner] accused Ms. Thompson of engaging in a sexual relationship with [Ms. Glenn]. The argument escalated to an assault during which the [petitioner] hit and pushed Ms. Thompson. The [petitioner] and Ms. Thompson moved their altercation downstairs where the [petitioner] hit [Ms. Glenn]. The children began crying, and the [petitioner] grabbed their older son, then four years old, and pushed him against the wall. "[F]inally" the [petitioner] exited out the front door.

Ms. Thompson testified that the [petitioner] could not re-enter the residence because she quickly locked the front and back door after his departure. Because he was unable to enter through a door, the [petitioner] broke the kitchen window. As the [petitioner] entered through the window, Ms. Thompson tried to push him back out, cutting her hands and arms on the broken glass in the process. The [petitioner] entered through the window and hit Ms. Thompson in the kitchen before walking to the living room area where he paced. According to Ms. Thompson, the [petitioner] dropped his phone, told Ms. Thompson to call the police, and then left. Ms. Thompson used the [petitioner's] cell phone to call the police. Ms.

Thompson was transported by ambulance to the hospital where she was treated for her injuries. The [petitioner] was later arrested and served six months in jail for this incident.

. . .

After hearing this evidence, the trial court granted the [petitioner's] motion seeking to exclude any testimony about the June 2013 domestic assault. In further discussions about potential testimony, the trial court advised defense counsel that, if the defense "open[ed] the door to the [2013] domestic assault, the rest of it comes in."

**B. Trial Testimony**

During the trial, the parties presented the following evidence: Larry Ellis and Matthew Bond, Chattanooga Police Department ("CPD") officers, were the first responders to a homicide scene located at East Lake Court housing project on 6th Avenue. As Officer Ellis approached the entryway to the unit, he saw the victim lying on the floor near the door, and three females and one male who were "very emotional and screaming." The officers separated the witnesses from the victim by moving the witnesses into the living room area. The officers also conducted a protective sweep of the unit and other than the previously mentioned adults and one child, found no one else present. Officer Ellis testified that the witnesses identified the shooter and described the truck that he left in. The victim was transported to the hospital, and the witnesses were transported to the police station for questioning.

James Metcalfe, the Hamilton County Chief Medical Examiner and Forensic Pathologist, testified as an expert witness in the field of forensic pathology. After examining the victim's body, Dr. Metcalfe concluded that the victim's manner of death was homicide and that the cause of death was a gunshot wound to the chest. . . .

Tirrea Tony testified that she was present in Ms. Thompson's apartment ("6[th] Avenue unit") at the time of the shooting. She said she was in the living room when the [petitioner] knocked on the door. Ms. Thompson opened the door to him, and the two argued in the kitchen about the [petitioner] seeing the children. Ms. Tony recalled that the younger child was asleep in the apartment, but the older child was not there. According to Ms. Tony, Ms. Thompson told the [petitioner] he should

leave. The victim came into the kitchen and reiterated that the [petitioner] needed to leave, saying "I don't want no problems." The [petitioner] responded that he did not want "no problems" either and walked out the door. The victim walked to the door to shut it, and the [petitioner] shot the victim in the chest. Ms. Tony testified that she did not see the victim with any weapon that night and did not hear him threaten the [petitioner].

. . . Ms. Tony confirmed that she did not see the gun or the gunfire.

Ms. Tony testified that, at the time of the shooting, the victim had "[h]is flag" in his pocket and his cell phone. After playing the 911 recording again, Ms. Tony agreed that she did not tell the 911 operator, when asked, who shot the victim and that she also denied knowing where the victim was shot. Ms. Tony, however, maintained that she was certain it was the [petitioner] who shot the victim.

. . .

Ronald White testified that Ms. Thompson was his sister and that the victim was his cousin. Mr. White recalled that he had stayed at his sister's residence the night of January 27, 2014, and was still there on January 28 when the [petitioner] came by asking to see his children. The [petitioner] knocked on the door, and Ms. Tony called upstairs to Ms. Thompson, who was in her bedroom with a "male friend . . . [Richard Morris]." Ms. Thompson went downstairs and opened the door to the [petitioner]. The victim knocked on the door of the room Mr. White was in and "told him to come down the steps" with the victim. The victim and Mr. White went downstairs and into the living room.

Mr. White testified that he overheard the [petitioner] and Ms. Thompson talking about their children. At some point, Mr. Morris came downstairs, and the [petitioner] asked Mr. Morris if he "was [] messing with [Ms. Thompson] now." Mr. Morris denied "messing with" Ms. Thompson, stating that she was "[j]ust [his] home girl." The [petitioner] told Mr. Morris that he had "no problem" with him, Mr. Morris left, and the [petitioner] and Ms. Thompson resumed their conversation about their children. The conversation between the two turned "loud," and Mr. White urged the [petitioner] and Ms. Thompson to "calm down" for the sake of their children.

- 5 -

Mr. White testified that the conversation between the [petitioner] and Ms. Thompson again escalated, so the victim walked into the room, opened the door for the [petitioner], and said, "we don't want no problems." The [petitioner] said that he did not want "no problems either" and then the shooting occurred. Mr. White said he was standing behind the victim and did not see the [petitioner] fire the gun but noted that the [petitioner] was the only person standing in the doorway. After the gunfire, the victim fell backward toward Mr. White, and Mr. White "pulled him in." Mr. White said that the victim grabbed his chest and was shaking. When Mr. White lifted the victim's shirt, he saw the gunshot wound and immediately ordered the others to call 911. He said that everyone was in shock and "flipping out," so he grabbed a phone and called 911.

Mr. White testified that, before the shooting, the victim did not threaten the [petitioner] or make any threatening gestures toward the [petitioner]. He said that the victim was closing the door when the [petitioner] shot him.

. . .

Ms. Thompson testified that in January 2014 she lived in the 6th Avenue unit with her two children, who were two and four years old at the time. Ms. Thompson explained that the victim was her cousin and Mr. White was her brother.

Ms. Thompson testified that she and the [petitioner] had been in a relationship for six years and, at one point, the [petitioner] had lived in the 6th Avenue unit with her but had moved out in June 2013. In the late afternoon of January 28, 2014, Ronald White, Raphael White, Ms. Tony, Mr. Morris, and "Lanesha" were present at the apartment. The [petitioner] came to the residence to "chill." She recalled that Ms. Tony heard the knock at the door and yelled upstairs to Ms. Thompson that the [petitioner] was at the door. Ms. Thompson was in her upstairs bedroom with her youngest son and Mr. Morris.

Ms. Thompson testified that she went downstairs and opened the door for the [petitioner]. Around that time, Mr. Morris was leaving. The [petitioner] and Mr. Morris exchanged a few pleasantries and then Mr. Morris left. The [petitioner] asked to see their youngest child, and Ms. Thompson explained that he was sleeping. The [petitioner] urged Ms. Thompson to go and wake the child so he could see him, but Ms.

Thompson declined, suggesting the [petitioner] come over to see their children another time. The [petitioner] asked Ms. Thompson for a cigarette, and she told him she did not have any. She continued to encourage him to leave, acknowledging that as she did so, she became "kind of loud." The victim then approached the [petitioner] saying "we don't want no problems," and the [petitioner] reiterated the same and began walking toward the door with his "hands up." As he walked out the door, he put his hand back in his pocket. The victim took hold of the door to shut it, and then Ms. Thompson heard gunfire. Ms. Thompson said that she did not see the gun but that the [petitioner] was the only person in the public hallway. After the gunfire, the [petitioner] took off running. Initially, she did not realize that the victim had been shot, but when the victim's shirt was lifted, she saw a gunshot wound.

. . . Ms. Thompson stated that, before the shooting, she did not hear the victim threaten the [petitioner] nor did the victim have a gun on his person.

. . .

Tim Pickard, a Chattanooga Police Department officer, testified that he was assigned to the fugitive unit and became involved in this case in February 2014 after other officers were unable to locate the [petitioner]. Officer Pickard said that typically, members of the unit will conduct interviews with relatives, close family members, or other people associated with a suspect in order to gain information on the suspect's location. After investigating numerous possible connections to the [petitioner], the fugitive unit obtained information that the [petitioner] was no longer in the Chattanooga area. Information about the [petitioner] was provided to the U.S. Marshals and subsequently Officer Pickard learned that the [petitioner] was found and arrested in Memphis, Tennessee on March 17, 2014.

James Plumlee, a CPD homicide detective, testified that, on January 28, 2014, he arrived at the crime scene at approximately 8:30 p.m. All potential witnesses had been transported to the police station for questioning, and the crime scene area had been "taped off" to protect any potential evidence. Detective Plumlee conducted the recorded interviews with Ms. Tony and Ms. Thompson. After officers had interviewed all the witnesses, they met to share the information learned and developed the [petitioner] as a suspect. The police department issued a "Be On The Lookout" ("BOLO") for the [petitioner]. Further, patrol officers were sent

to addresses of some of the [petitioner's] relatives in an attempt to locate the [petitioner].

. . .

The [petitioner] testified that he had two children with Ms. Thompson. He said that he stood five feet three inches tall and weighed 138 pounds in January 2014. About visitation with his children, the [petitioner] said that, following the end of his romantic relationship with Ms. Thompson, on the day he wanted to see the children he would contact Ms. Thompson via Facebook or call Ms. Thompson's mother, Marylyn Thompson. The [petitioner] stated that he was "homeless" but, when he had time with his children, he would go to a family member's or friend's house. He usually had the children in six or seven hour increments and would make arrangements for "a ride" to return the children to Ms. Thompson at East Lake Courts.

. . .

The [petitioner] testified that he had known the victim and Mr. White for many years. He explained that the victim and the [petitioner's] younger brother, Nathan Jennings, had gone to school together. The [petitioner] recalled that approximately two years before the shooting, in 2012, the [petitioner] and the victim had engaged in an argument at Marylyn Thompson's residence. The [petitioner] said that he had gone to Marylyn Thompson's residence to see Ms. Thompson. While still outside, the victim approached the [petitioner] and accused him of "disrespecting Mar[y]lyn Thompson." The two began to argue and "tussle," but no one was hurt during the exchange. He described the victim as six feet one inch tall and weighing approximately 175 pounds in comparison to the [petitioner's] smaller stature.

The [petitioner] confirmed that he was convicted of robbery in 2006 and domestic violence and vandalism. As to the latter two offenses, the [petitioner] explained that he was "staying with" Ms. Thompson at her 6th Avenue unit. Ms. Thompson had a friend over at the time, and the [petitioner] wanted the friend, Kionna Glenn, to leave because he felt that Ms. Thompson "act[ed] funny toward[] [him]" in Ms. Glenn's presence. Ms. Thompson refused to ask Ms. Glenn to leave, so the [petitioner] left to "drink" and "stuff like that." When the [petitioner] returned, he again raised the issue of Ms. Glenn leaving, and Ms. Thompson "just went off."

- 8 -

The two began to argue and "stuff." He felt badly about the exchange, so he left his cell phone with her to call the police and walked to Waffle House.

The [petitioner] testified that, while he was incarcerated for the domestic assault conviction, he spoke with his brother on the phone. His brother told him to be careful because the victim had threatened to "get" the [petitioner] when he saw him next. The [petitioner] and victim were incarcerated at the same facility for a period of time, and the victim confronted the [petitioner] verbally about the incident with Ms. Thompson but initiated no physical contact. The [petitioner] avoided the victim after that.

The [petitioner] testified that he had seen the victim before with a gun at Marylyn Thompson's residence. He recalled that he was on the front porch of the residence when the victim arrived. The victim's eye was swollen and bleeding, and the [petitioner] saw a gun in the victim's back pocket as the victim paced back and forth angrily while ranting. The [petitioner] said that Mr. White prevented the [petitioner] from getting involved saying that his brother was "crazy."

The [petitioner] testified that on January 28, 2014, he was staying at a hotel on Broad Street. He contacted Marylyn Thompson to arrange to see his children. He was unable to contact Marylyn Thompson until 3:00 or 4:00 p.m. Marylyn Thompson told the [petitioner] that Ms. Thompson and the older child had gone home. At around 5:15 p.m. the [petitioner] rode with a friend, Prentice Barnette, to East Lake to try to see his children. The [petitioner] confirmed that the Chattanooga Housing Authority had placed him on a no trespass list for East Lake Courts but that he had told his oldest child that he would spend time with him that week, so he planned to pick up the children and leave.

The [petitioner] testified that Mr. Barnette dropped him off outside the 6th Avenue unit and left. He knocked on the door and Ms. Tony called out asking who it was and then told Ms. Thompson that the [petitioner] was at the door. He waited a few minutes, and then Ms. Thompson opened the door holding a "blunt in her hand." The [petitioner] asked to see the children, and Ms. Thompson said that their older son was at her mother's residence and their younger child was upstairs asleep. The [petitioner] said he did not believe her because he had just spoken with Marylyn Thompson who said that the children were at home. The [petitioner] offered to get the

children "ready" if she would "go get them," and Ms. Thompson agreed. She stepped back inside, and the [petitioner] asked if he could wait inside due to the cold. Ms. Thompson agreed, and he stepped inside and closed the door before asking Ms. Thompson for a cigarette. Ms. Thompson stated she did not have one, and the [petitioner] walked into the kitchen area where he waited alone for about seven minutes.

The [petitioner] testified that the victim, Mr. White, and Ms. Thompson came down the stairs, and the victim walked down a "little hallway," making no eye contact with the [petitioner]. The [petitioner] observed a "black flag" hanging out of the victim's back pocket with a firearm. The victim walked out the door and shut it behind him. The [petitioner] explained that he became nervous as soon as he saw the victim. Ms. Thompson and Mr. White walked into the kitchen where the [petitioner] was waiting. Mr. White was holding a cell phone and "snickering" while looking at the [petitioner], and Ms. Thompson looked paranoid "like something was about to happen." Richard Morris then came downstairs and into the kitchen. The [petitioner] stated that he had been unaware that Mr. Morris was in the residence. The [petitioner] asked Mr. Morris if he was "over here with my baby mama," and Mr. Morris responded, "no, we cool." Mr. Morris walked over to Ms. Thompson, asked if she was okay, and then "hurried up and got up out of there like something bad was going to happen." About a minute later, the victim re-entered the apartment.

The [petitioner] testified that he, Ms. Thompson, Mr. White, and the victim were all in the kitchen within close proximity to one another. He testified about the interactions leading up to the shooting as follows:

> [The victim's] in my face like this. Just looking at me. So I was like all right, where [was my child] at. And my baby mamma looked at me and she was like, I don't know. Then I was like, all right. Before I leave why did you do the kids like that the other day. And when she came and got the kids she was being rough with them and hurried them up in the car. And the moment I said that [the victim] was like because I told her to. Ain't no mother f**kin 50th Street in St. Elmo. I was like it is a 50th Street in St. Elmo. You misunderstood what I said. But as I'm saying this I'm not looking at him. I'm looking at [Ms. Thompson]. You know what I'm saying, talking to [Ms. Thompson]. And I said--I

- 10 -

put my hands up, I said look, I don't want no trouble. And when I said I don't want no trouble he said, well, if you don't want no problems it's going to be some problems and went to reach for his firearm and that's when I jumped out--before I did that I put my hands up, I put my hands in my pocket and he said well, you don't want no problems there's going to be some problems and when he went to reach for his firearm I jumped back out the way like towards the left because as he's saying I don't want no--as he's saying if you don't want no problems there's going to be some problems he moves from right there where he at to in front of me.

[I thought] my life was fixin to end or I was going to get seriously injured. Because [the victim] is like way taller and bigger than me. And if he was to grab em it ain't nothing I can do with it.

The [petitioner] testified that when the victim reached for his firearm, "a .38 Special double action," he took a "quick side step to the left" and then took out his gun "all in one motion." The [petitioner] said he raised his hand up and then pulled the trigger. At the time the [petitioner] fired his gun, he estimated that he and the victim were about three or four feet apart. The [petitioner] admitted that he was not allowed to have a gun on Chattanooga Housing Authority property. The [petitioner] recalled that, after he fired his gun, the victim fell straight back on the ground and began "scooting" backward. He said that Ms. Thompson was standing behind the victim and that Mr. White was on his cell phone at the time. He said that he began to pace, considering whether he should offer help but felt that he would then have to "wrestle" with Mr. White. He believed it was safer to leave. As he left, he saw Ms. Tony standing at the end of the public hallway.

. . .

The [petitioner] testified about the black bandana he had seen tied to the gun in the victim's pocket. He said a black bandana is the type of bandana worn by members of the Gangster Disciples, a gang "out of Chicago, Illinois." The [petitioner] described the presence of Gangster Disciples as "the deepest gang in Chattanooga as far as numbers." He said there were members in every area of the city. He said the bandanas are tied with "the knot part . . . on the gun." The black "flag" was tied in this manner on the victim's gun and, when the [petitioner] saw it, he believed it

"mean[t] war time." When the [petitioner] saw the "black flag," he "began to fear for [his] life" and tried to determine how to escape safely. The [petitioner] explained that he fled to Memphis in an attempt to avoid gang retaliation against him and his family.

The [petitioner] testified that he felt "bad" about the shooting but, at the time, felt he had no other choice. He said if he had not shot the victim, he would have been killed.

On cross-examination, the [petitioner] agreed that in June 2013, he and Ms. Thompson argued and, after the argument, he was issued a no trespassing notification. Despite the notification, two days later he returned to the property heavily intoxicated. He engaged in another argument with Ms. Thompson and punched Ms. Thompson in the face one time. The [petitioner] denied breaking a window to try to re-enter Ms. Thompson's residence, and he denied shoving his son. The [petitioner] agreed that he pleaded guilty to domestic assault and vandalism for this incident, served six months in jail, and was released in December 2013. Two weeks after his release from jail, the [petitioner] contacted Ms. Thompson via Facebook and arranged to pick his children up at Ms. Thompson's residence. The [petitioner] agreed that both the victim and Mr. White were aware that the [petitioner] had "beaten up" Ms. Thompson and that "they didn't like that." The [petitioner] admitted that he shot and killed the victim but maintained that he did so in self-defense.

The [petitioner] testified that he purchased the gun he shot the victim with from a "junkie" three weeks after he was released from jail. He admitted that he was not allowed to carry a gun because he was a convicted felon. The [petitioner] agreed that when he went to Ms. Thompson's residence on the night of January 28, 2014, he knew that he was not allowed to be there due to the no trespass notification and he knew that he was breaking the law by carrying the gun. The [petitioner] denied rehearsing for his testimony at trial. He agreed that the trial was the first time he had claimed self-defense and that he did not contact the police or speak with the police following the shooting about his claim of self-defense. When asked about his refusal to speak with Detective Plumlee following his arrest in Memphis, the [petitioner] stated that he had "invoked [his] right to remain silent."

The [petitioner] agreed that he knew "a lot" about gangs but denied being a member of the Traveling Vice Lords. He denied that two of his

tattoos had any relationship to gang affiliation. He agreed, however, that he had made posts on Facebook about "King Neal" who is "head of "Vice Lord." The post read "long live King Neal."

Curtis Penney, a CPD officer, testified that he was assigned to the organized crime division, criminal intelligence unit. He explained that this unit identifies and monitors chronic offenders such as gangs or "large scale drug dealings." As part of his job, he gathers "intelligence" through social medial, digital surveillance, interviews, and interrogations. Officer Penney confirmed that in his sixteen year career with the police department he had "worked a lot" with gang-related crime and had become familiar with the gang presence in Chattanooga. Officer Penney testified that gang members identify themselves by "flagging," which means that they carry a specific color bandana or certain tattoos.

Officer Penney stated that, at that time, gangs were the "biggest threat" to Chattanooga. He said that one of the difficulties with prosecuting cases involving gang members was witness intimidation. Officer Penney confirmed that he was familiar with the East Lake Courts area and said that there were two gangs that were prominent in that area: "[t]he Gangster Disciples, and some of our Crip sets." He said that one of the Gangster Disciples' rivals was the Vice Lords, both gangs originating in Chicago. Defense counsel asked Officer Penney what it would mean if a member of the Gangster Disciples displayed a gun tied with a black flag for a member of the Vice Lords. Officer Penney responded that the Vice Lord member would view this as a sign of disrespect.

. . .

The State then called Ms. Thompson in rebuttal. . . .

Ms. Thompson confirmed that in June 2013 the [petitioner] received a trespass notification because the two were arguing at her 6th Avenue unit. Two days later, the [petitioner] returned late at night between 11:00 p.m. and 12:00 a.m. . . .

The defense then presented testimony from Christopher Robinson, a private forensic consultant, who testified as an expert in the field of firearms analysis, ballistics, shooting reconstruction, and "policies and procedures for testing of DNA." Mr. Robinson stated that he was "certified in the disciplines of firearms analysis, gunshot residue analysis, crime scene

reconstruction, shooting reconstruction, and gunshot wound analysis." In evaluating the [petitioner's] case, Mr. Robinson had reviewed the discovery including materials from the police department, the crime lab reports, photographs, any video and audio recordings. Mr. Robinson visited the crime scene, spoke with the medical examiner, spoke with the [petitioner], and had sat through the entirety of the trial listening to all the witnesses.

. . .

Mr. Robinson testified that when he visited the crime scene he entered an adjacent unit with the same measurements as Ms. Thompson's unit. He described the kitchen area of the unit as "extremely tight" and "very close quarters." The medical examiner told Mr. Robinson during their meeting that the trajectory of the bullet had no upward or downward deviation but was a straight path through the chest. Mr. Robinson stated that, given the victim's height versus the [petitioner's] height, there should have been an upward deviation in the bullet path unless the victim was moving toward the [petitioner] in a downward motion, causing a straight path through the body. Mr. Robinson opined that this was consistent with the [petitioner's] assertion that he acted in self-defense.

. . .

In rebuttal, the State called Russ Davis, a TBI forensic scientist. Mr. Davis testified as an expert witness in the field of gunshot primer residue. In relation to this case, Mr. Davis tested a black bandana collected from the victim for gunshot primer residue at the [petitioner's] request. Mr. Davis did not find gunshot primer residue on the bandana. . . .

*Rodney Jennings*, 2018 WL 1168723, at *1-12 (footnotes omitted).

The petitioner proceeded with his post-conviction claims pro se, filing an original petition followed by two amendments. In the petitions, the petitioner alleged trial counsel was ineffective for failing to object to: "the State eliciting testimony about Christopher Robinson's job related reprimands;" "the State asserting [its] personal opinion as to the truth or falsity of [the petitioner's] testimony during the State's closing argument;" "the prosecutor stating that [the petitioner] was agitated about not being able to see [his] son during the State's opening statements;" "the introduction of inflammatory 911 calls;" and "the prosecution's exploitation of [the petitioner's] pre-trial exercise of the right to remain silent." The petitioner also alleged trial counsel erred by questioning him during trial about his 2013 domestic assault conviction and gang affiliation, thus

opening the door to evidence of his bad character which trial counsel also did not object to as the State cross-examined the petitioner. Both the petitioner and trial counsel testified at the evidentiary hearing held on January 25, 2019.[3]

Trial counsel explained she intended to present a theory of self-defense at trial while also avoiding opening the door to evidence of the petitioner's character for violence or bad acts. To that end, trial counsel filed a motion in limine to exclude the petitioner's 2013 domestic assault conviction from evidence. Though the trial court granted the motion, trial counsel believed the petitioner opened the door to evidence of the domestic assault during his testimony. Specifically, trial counsel asked the petitioner "something to the effect of why did [he] not want the victim to know [his] address or know where [he] lived." Trial counsel expected the petitioner to state he feared the victim, but she "was surprised because [the petitioner's] answer alluded to that 2013 domestic assault." Based upon the petitioner's answer, trial counsel believed the petitioner opened the door to the admissibility of character evidence which she chose to "deal with [] on direct rather than letting the State hammer it in front of the jury for the first time." Trial counsel admitted a better practice would have been to obtain a ruling from the trial court as to whether the petitioner opened the door to evidence of his character. However, she maintained "that the door was opened at that point and there was nothing that [she] could do except to try to minimize it."

Consequently, trial counsel also did not object to the State questioning the petitioner about the June 3, 2013 trespass notice. Because she did not specifically recall the incident, trial counsel reviewed a "trespass notice from C[hattanooga] H[ousing] A[uthority] Officer James Avery." She recalled Officer Avery testified on behalf of the State "to negate a self-defense argument and a self-defense jury instruction . . . to show that [the petitioner] [was] not allowed to be [at the apartment] on the day in question."[4] Trial counsel did not recall the State questioning the petitioner about the details of the trespass notice, when the trespass notice was entered into evidence, or why she would or would not have objected to the same. As a result, she could not opine as to whether the facts of the incident prejudiced the petitioner's case. Trial counsel noted the petitioner's trespass status was relevant to the State's rebuttal of the petitioner's self-defense theory and as such, she did not object to its introduction.

Trial counsel also addressed the defense's approach to the introduction of evidence of both the petitioner's and the victim's gang affiliations. According to trial counsel, she and the petitioner discussed the petitioner's knowledge of the victim's prior

---

[3] While the petitioner continued pro se, the trial court appointed elbow counsel to assist the petitioner during the hearing.

[4] The trespass notice, along with the complete trial transcript, was entered into evidence at the hearing.

violence "at length."  Trial counsel recalled a question in which the petitioner sought to explain the significance of the bandana he saw on the victim's firearm prior to the shooting and why he was afraid of the victim as a result.  Because the petitioner's answer called on his knowledge of the victim's gang affiliation, before he provided the same, the trial court limited the petitioner's testimony about his knowledge of the victim's gang affiliation to the petitioner's reasonable perceptions and his reason for fleeing the scene.

The trial court noted if the petitioner discussed the victim's gang affiliation, "[the petitioner] would be subject to the same thing," and trial counsel agreed that by opening the door to the victim's character, the petitioner's character could also be attacked.  According to trial counsel, she and the petitioner weighed the consequences of opening the door "a lot," noting "we talked about that at length.  But with the defense theory of self-defense and [the petitioner's] apprehension of the victim, it was almost impossible to avoid that, if not impossible."  Trial counsel agreed it would have been best to avoid the victim's gang affiliation altogether based upon the petitioner's character for violence.  But, because the petitioner opened the door to the introduction of the evidence during his testimony, trial counsel did not object when the State questioned the petitioner about his own gang affiliation.

Trial counsel next addressed several evidentiary decisions made during trial.  Regarding the State's cross-examination of defense expert, Christopher Robinson, trial counsel stated she did not object when the State questioned Mr. Robinson about his job-related reprimands because she believed "the State had a right to ask him about those issues . . . because it was relevant to his credibility."  Regarding the State's opening and closing arguments, trial counsel stated she did not recall the State opining on the truth or falsity of the petitioner's testimony during closing arguments.  After reviewing the trial transcript, trial counsel explained she did not object to the State's closing argument because "I didn't think the affirmative statement of the prosecutor saying [the petitioner] lied was him inserting his personal opinion about [the petitioner's] credibility."  Similarly, trial counsel also did not find the State's opening statement, wherein it claimed the petitioner was agitated about not being able to see his son, objectionable as she believed the petitioner made statements supporting this claim, though she could not recall any specifics.  Finally, trial counsel admitted she "probably should have" objected when the State questioned the petitioner about his decision not to speak with Detective Plumlee prior to trial, and she did not remember why she did not object to the State questioning the petitioner about the petitioner's waiver of rights.

The petitioner entered three 911 phone calls into evidence at the hearing.  After playing the three phone calls, trial counsel stated she did not object to the introduction of the evidence because she "didn't think [the calls] were objectionable."  Regarding the 911 call made by Penny Collier, wherein Ms. Collier stated she heard someone say he

was going to kill everybody, trial counsel admitted she did not know whether Ms. Collier had personal knowledge of the statement but remembered she attempted to "get in touch with [Ms. Collier]" prior to trial. Trial counsel could not recall why she did not redact Ms. Collier's 911 call. Trial counsel also did not recall why she did not object to Tirrea Tony identifying her 911 call or the State's questioning of Ms. Tony regarding the call. The petitioner also entered into evidence the 911 call made by Cheslei Thompson on June 5, 2013, during the domestic assault incident. After doing so, trial counsel explained she did not object to the introduction of the same because she "believed [the petitioner] opened the door."

During cross-examination, trial counsel explained she was appointed to the petitioner's case in July 2015, and she tried the case in April 2016 with the assistance of co-counsel. Trial counsel met with the petitioner before trial and discussed his decision to testify. Trial counsel understood from the beginning stages of the case that the petitioner intended to testify, but explained the petitioner "didn't want to prepare for his testimony because he didn't want to seem coached." Trial counsel indicated she "would have liked to have gone through the topics that we were going to address," but she did not believe the petitioner "wanted to do that with [her]." Despite the fact she and the petitioner did not fully prepare for his testimony, trial counsel "remember[ed] telling [the petitioner] that any time a defendant testifies that it's going to put him at risk of opening the door for character evidence." Trial counsel conducted a *Momon*[5] hearing and discussed the potential pitfalls of testifying with the petitioner after which the petitioner chose to testify. Despite the inherent risks, trial counsel did not know how to raise the theory of self-defense absent the petitioner's testimony.

Regarding the introduction of evidence of the domestic assault, trial counsel explained she did not intend on introducing that evidence as its inadmissibility was fully litigated prior to trial. However, the defense planned to introduce evidence of the victim's gang affiliation "because of the bandana that was tied to the gun in the victim's pocket." Trial counsel and the trial court both explained to the petitioner that "if we explored [the victim's gang affiliation] that [the petitioner's] affiliation or his character to that extent could be attacked." Trial counsel believed the petitioner understood the options he faced regarding this issue.

Trial counsel met with Mr. Robinson several times before trial and obtained expert funds to retain him. Trial counsel did not recall the specific job-related issues addressed by the State during Mr. Robinson's cross-examination, but remembered Mr. Robinson

---

[5] *Momon v. State*, 18 S.W.3d 152, 157 (Tenn. 1999).

discussed his issues[6] with her and they were "all about political funding basically." She did not remember that Mr. Robinson shot himself in the hand while working.

Turning again to the petitioner's direct examination, trial counsel explained the petitioner surprised her with his answer to her question of "why [the petitioner] did not want the victim to know where he lived or to know his address." When trial counsel asked the petitioner the same question during a jail visit, the petitioner answered that he was afraid of the victim. At trial, however, the petitioner answered the question by referencing the domestic assault incident with Ms. Thompson. Trial counsel believed the petitioner's answer at trial "opened the door to [the domestic assault conviction]; and so [she] thought at that point [she] had to deal with it on direct." In order to diminish the impact of the testimony, trial counsel asked the petitioner to explain what he was talking about. During re-direct examination, trial counsel again confirmed she did not intend to open the door to the petitioner's character for violence in support of their theory of self-defense, but noted their defense theory "kind of morphed" from apprehension-of-the-victim to first-aggressor after "all the character evidence came in."

The petitioner then testified, stating he met with trial counsel approximately four or five times before trial, but they "never discussed the gang affiliation." According to the petitioner, they "only discussed what happened leading up to the shooting, and I stressed to her that I wanted to pursue an apprehension-of-the-victim self-defense theory because I had a character for violence myself," and he did not want to open that door. However, the petitioner knew "[t]hat if I testified that I would be waiving my rights, and I totally understood that. And I signed my waiver -- my rights waiver form, and I took the stand and testified." The petitioner planned to testify at trial to support the defense theory of apprehension-of-the-victim, believing this theory would "avoid opening the door to [his] character for violence."

Regarding his understanding of how he planned to use his knowledge of the victim's character at trial, the petitioner stated, "I never discussed with [trial counsel] using evidence of my knowledge of the victim's gang affiliation to prove my fear. I only discussed prior incidents that I had with [the victim]. One being the prior fight, and, two,

---

[6] Though not specifically addressed at the evidentiary hearing, the record indicates the State questioned Mr. Robinson regarding a 2001 reprimand he received while working at the Georgia Bureau of Investigation ("GBI"). The reprimand involved Mr. Robinson's failure to follow proper procedures while testing a firearm which resulted in Mr. Robinson shooting himself. Mr. Robinson also discussed another reprimand he received wherein he rendered an opinion regarding muzzle to target determinations absent all of the information needed to form an opinion. In addition, the State questioned Mr. Robinson regarding the results of his 2002 and 2003 annual reviews at the GBI. Finally, the State questioned Mr. Robinson regarding his more recent termination from the Atlanta Police Department for failing to follow proper protocols though Mr. Robinson explained his understanding of his termination during trial.

[] where I seen him have a firearm in his right back pocket." The petitioner reviewed a portion of the trial transcript wherein the trial court, trial counsel, and the State discussed the introduction of gang-related evidence. The petitioner summarized the arguments, noting the State argued gang-related evidence should be excluded based upon its prejudicial nature and its potential to open the door to the domestic assault conviction while trial counsel argued the defense should be allowed "to put forth [the petitioner's] knowledge of [the victim's] gang affiliation to show how [the petitioner] perceived the flag in his back pocket" in order to "prove [the petitioner's] state of mind." By doing so, however, the petitioner did not believe he was "opening the door to [his] gang affiliation."

The petitioner also stated he invoked his right to remain silent prior to trial, and trial counsel did not object to the State's questioning of the petitioner's decision during his trial testimony. In conclusion, the petitioner stated:

> . . . I wish [trial counsel] had of stuck to our original plan and objected to the Fifth Amendment right, my Fifth Amendment rights being violated, and the 911 tapes being played throughout the trial. And had [trial counsel] done those things, the outcome of the trial would have been different. And due to all the prejudice I sincerely feel that the jury's attention was directed toward the prejudice and not the real evidence at trial. Convicted me based on my bad character.

The post-conviction court reviewed the evidence and denied relief. This timely appeal followed.

### *Analysis*

On appeal, the petitioner asserts the outcome of his trial would have been different absent the deficiencies of trial counsel. The petitioner argues trial counsel was ineffective in her handling of specific testimony elicited at trial regarding the petitioner's domestic assault conviction, his gang affiliation, and the details surrounding a trespass notice issued against him. The petitioner also argues trial counsel was ineffective for failing to investigate Christopher Robinson's background before using him as an expert and for failing to have Penney Collier's 911 phone call redacted. Following our review of the record and the submissions of the parties, we affirm the judgment of the post-conviction court.

The petitioner bears the burden of proving his post-conviction factual allegations by clear and convincing evidence. *See* Tenn. Code Ann. § 40-30-110(f). The findings of fact established at a post-conviction evidentiary hearing are conclusive on appeal unless

the evidence preponderates against them. *See Tidwell v. State*, 922 S.W.2d 497, 500 (Tenn. 1996). This Court will not reweigh or reevaluate evidence of purely factual issues. *See Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997). However, appellate review of a trial court's application of the law to the facts is *de novo*, with no presumption of correctness. *See Ruff v. State*, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel presents mixed questions of fact and law. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Thus, this Court reviews the petitioner's post-conviction allegations *de novo*, affording a presumption of correctness only to the post-conviction court's findings of fact. *See id.*; *Burns v. State*, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner must show both that counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceedings. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the standard for determining ineffective assistance of counsel applied in federal cases is also applied in Tennessee). The *Strickland* standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687. In order for a post-conviction petitioner to succeed, both prongs of the *Strickland* test must be satisfied. *Id.* Thus, courts are not required to even "address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.*; *see also Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996) (stating that "a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

A petitioner proves a deficiency by showing "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the *Strickland* test is satisfied when the petitioner shows there is a reasonable probability, or "a probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. However, "[b]ecause of the difficulties inherent in making

the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

### I.     Character Evidence of the Petitioner

The petitioner first argues trial counsel "was deficient in eliciting testimony about [his] domestic assault conviction[] because the State was not approved by the [trial court] to use the domestic assault conviction to impeach." The petitioner further suggests if the trial court had allowed the State to use the domestic assault conviction, the State "would have been limited to the date and fact of the conviction," thus, trial counsel was deficient in eliciting testimony about the details of the same. The petitioner argues the details of the domestic assault conviction prejudiced the trial "because it shows that [he] [has] a propensity to commit a crime." The State contends trial counsel made a strategic decision to address the domestic assault conviction during direct examination after the petitioner opened the door with an unexpected answer during his testimony, and we agree.

At the post-conviction hearing, trial counsel explained that both prior to and during trial she asked the petitioner why he did not want the victim to know where he lived. Each time she asked the question, the petitioner provided different answers. Prior to trial, the petitioner answered by stating he was afraid of the victim. However, at trial, the petitioner answered by stating "[i]n retaliation for something that I did in the past that I'[m], very regretful for." Trial counsel was surprised by the petitioner's trial answer and believed he opened the door to the introduction of evidence about his domestic assault conviction. As such, trial counsel decided to address the damaging evidence during direct examination rather than wait for the State to impeach the petitioner with evidence of the conviction during cross-examination.

Accordingly, the record shows trial counsel made a strategic decision to address the petitioner's domestic assault conviction during his direct examination after the petitioner opened the door to the same. "The fact that a particular strategy or tactical decision failed does not by itself establish deficiency." *Nesbit v. State*, 452 S.W.3d 779, 796 (Tenn. 2014) (citing *Goad*, 938 S.W.2d at 369). In denying relief on this issue, the post-conviction court accredited the testimony of trial counsel and found "it was a reasonable tactical decision by [t]rial [c]ounsel to 'steal the State's thunder' by discussing the prior offense on direct examination." We agree. The petitioner has failed to demonstrate trial counsel's defense strategy was unreasonable, fell below professional norms, or that it prejudiced the outcome of his case. *Goad*, 938 S.W.2d at 369 (citing

- 21 -

*Strickland*, 466 U.S. at 687, 688; *Baxter*, 523 S.W.2d at 936). Instead, the record indicates trial counsel attempted to diminish the damaging evidence of the petitioner's prior conviction by addressing it during his direct examination rather than allowing the State to reveal the evidence to the jury during cross-examination. The petitioner is not entitled to relief.[7]

Similarly, the petitioner claims trial counsel was ineffective "by failing to object to the State's improper questions concerning facts leading up to the trespass notification" because "[t]he door was not opened to the June 3, 2013 disorderly conduct incident by the defense." The petitioner asserts he was prejudiced by this evidence as it again "shows that [he] has a propensity to commit a crime." At the post-conviction hearing, trial counsel explained she did not object to questions regarding the trespass notice because it was relevant to the State's rebuttal of the defense's theory of self-defense and, as a result, she did not believe it was objectionable. Our review of the record supports trial counsel's testimony as evidence of the trespass notice was clearly admissible. Accordingly, the petitioner cannot prove prejudice regarding trial counsel's handling of this evidence at trial. *Strickland*, 466 U.S. at 687, 694; *see also Goad*, 938 S.W.2d at 370. The petitioner is not entitled to relief.

Finally, the petitioner asserts trial counsel "was ineffective by eliciting testimony about the victim's gang affiliation" in an effort to prove the petitioner's state of mind "because there was [also] proof of [the petitioner] being a gang member." The petitioner argues once again that the jury convicted him based upon his bad character and that trial counsel's handling of this evidence "was not based on the law and facts of the case." The State asserts trial counsel utilized this evidence to support the defense theory of self-defense, a strategy accredited by the post-conviction court. We again agree with the State.

The record makes clear the petitioner and trial counsel pursued a self-defense theory at trial. Trial counsel explained she wanted to discuss the victim's gang affiliation in order to show the petitioner acted in self-defense based upon his fear of the victim. However, trial counsel did not know how to present the defense absent the petitioner's testimony. As a result, trial counsel attempted to prepare the petitioner for the inherent risks of testifying, including the risks he faced in discussing the victim's gang affiliation, but the petitioner wanted to testify absent much direction from trial counsel. Regardless,

---

[7] In reviewing the petitioner's direct appeal issues concerning the introduction of this evidence at trial, this Court determined "the defense had already elicited testimony about the 2013 domestic assault, which opened the door to the prosecution's line of questioning" and "there is no dispute that the [petitioner] placed the 2013 domestic assault at issue during his proof." *Rodney Jennings*, 2018 WL 1168723, at *13, 14.

after the petitioner waived his rights and began testifying at trial, both the trial court and trial counsel warned him if he opened the door to the victim's gang affiliation he would be subject to the same attack by the State. The petitioner proceeded with his testimony, explaining he saw a bandana tied to the victim's firearm which led him to fear the victim based upon his known gang affiliation which opened the door for evidence of the petitioner's gang affiliation to come into trial.

It is evident trial counsel made a strategic decision to address the victim's gang affiliation during the petitioner's testimony in order to support the theory of self-defense. Though the jury rejected the theory, the jury's rejection is not evidence of deficiency. *Nesbit*, 452 S.W.3d at 796. The post-conviction court determined, "[a]t the point in time where the decision was made to explain [the petitioner's] perception of the victim further, [t]rial [c]ounsel had considered the consequences of doing so and believed this to be the best course in which to pursue the claim of self-defense." Additionally, the post-conviction court held, "[f]rom the perspective of [t]rial [c]ounsel, it was reasonable to believe that without additional proof that the victim intended to harm [the petitioner] in the moment, the claim of self-defense would have been substantially weakened." We agree. Nothing in the record demonstrates trial counsel's strategy regarding gang-affiliation evidence was not sound and the petitioner has failed to show that trial counsel's strategy regarding the evidence amounted to deficient performance. *Strickland*, 466 U.S. at 689; *see* Tenn. Code Ann. § 40-30-110 (f); *Goad*, 938 S.W.2d at 369. Instead, the record shows trial counsel made a strategic decision to use the victim's gang affiliation to support the theory of self-defense, a strategy which was supported by the petitioner and for which he was fully advised. The petitioner is not entitled to relief.[8]

---

[8] Furthermore, in addressing the introduction of gang-related evidence on direct appeal, this Court determined:

> On direct examination, the [petitioner] testified about his knowledge of gangs and the victim's affiliation with the Gangster Disciples, which caused him apprehension on the night of the shooting and compelled his subsequent flight. On cross-examination, the State asked if the [petitioner] was affiliated with the Traveling Vice Lords, and the [petitioner] denied any affiliation. The State also inquired about the [petitioner's] tattoos, and the [petitioner] maintained that his tattoos had no relationship to a gang. The defense raised no objection to the State's line of questioning.

> The [petitioner] did not object to the questions asked by the State; therefore, the issue is waived. Nonetheless, the defense had already elicited `testimony about the` knowledge about local gangs, which opened the door to the prosecution's line of questioning.

*Rodney Jennings*, 2018 WL 1168723, at *15 (citations omitted).

II.    Ms. Collier's 911 call

The petitioner argues trial counsel was ineffective for failing to redact portions of Ms. Collier's 911 phone call based upon unreliable hearsay statements made during the call. The petitioner further asserts Ms. Collier's statements "did not qualify as an excited utterance because her 911 call does not indicate that she saw the shooting" and her statements were "detrimental to [the petitioner's] self-defense theory." The State contends trial counsel's handling of Ms. Collier's call was not deficient as she objected to the introduction of the same based upon a violation of the Confrontation Clause.

Though trial counsel lacked a precise recollection of her handling of this evidence, the record demonstrates trial counsel objected to the introduction of Ms. Collier's 911 call as a violation of the Confrontation Clause while the State argued the call fell under the excited utterance exception to the hearsay rule. The trial court agreed with the State and overruled trial counsel's objection. Upon its review, the post-conviction court explained the issue, as follows:

> The [c]ourt does not believe that the phone call was subject to an objection on the basis of a lack of personal knowledge. . . .

> In this case of Ms. Collier's 911 call, she stated that she "heard" someone make a statement that [the petitioner] contests. . . . The fact that Ms. Collier acknowledged that she heard the statement was sufficient to establish her personal knowledge of the statement itself. As such, the [c]ourt disagrees that [t]rial [c]ounsel's failure to object to this phone call on the basis of a lack of personal knowledge was deficient performance.

> The [c]ourt also finds that [t]rial [c]ounsel's performance in failing to object to the admission of this call based on other grounds, or [t]rial [c]ounsel's failure to request redactions, was not deficient. The statement overheard by Ms. Collier was relevant to establish (or to confirm) [the petitioner's] anger prior to, or during, the shooting of [the victim] and to rebut his claim of self-defense. Moreover, the [c]ourt does not find that anything in the 911 call was unfairly prejudicial to [the petitioner], as the evidence did not have "an undue tendency to suggest a decision on an improper basis, frequently, though not necessarily, an emotional one." As such, [the petitioner] has failed to show that Rule 403's balancing test would not have excluded the evidence at trial.

> Finally, although [the petitioner] was able to contradict this statement with other proof at trial -- at least one of the witnesses denied

- 24 -

hearing such a statement -- and although [the petitioner] denied making the statement at the post-conviction hearing, the contested nature of the evidence did not render its admission "unfairly prejudicial." Indeed, while the contested nature of the evidence may have impacted the weight of the evidence in the balance, it did not affect its admissibility. Consequently, [the petitioner] has failed to show that [t]rial [c]ounsel rendered deficient performance in not raising objections to Ms. Collier's phone call. Accordingly, the [c]ourt respectfully declines to grant post-conviction relief with respect to this issue.

Upon our review, we agree with the post-conviction court's assessment of trial counsel's handling of Ms. Collier's 911 phone call. Trial counsel objected to the introduction of the call based upon the Confrontation Clause, but the trial court determined the call was admissible as an excited utterance, thus eliminating any confrontation arguments. Though trial counsel's objection was unsuccessful, per *Davis v. Washington*, any objection made on the basis of the Confrontation Clause or hearsay would have been unsuccessful. 547 U.S. 813, 828 (holding, generally, that 911 calls are nontestimonial in nature as the interrogation that arises during such calls "objectively indicate[s] its primary purpose was to enable police assistance to meet an ongoing emergency"). Therefore, the petitioner cannot show that trial counsel was deficient or that he was prejudiced by trial counsel's handling of Ms. Collier's 911 phone call as it was clearly admissible evidence. *Id.* The petitioner is not entitled to post-conviction relief as to this issue. *Strickland*, 466 U.S. at 694.

III.    Christopher Robinson

The petitioner asserts "[p]roof of Christopher Robinson's reprimands were detrimental to [his] self[-]defense theory" and "[d]eference cannot be made to [trial counsel's] choice of calling Christopher Robinson to testify because she did not thoroughly investigate [his] background." The State argues the petitioner waived this claim for failing to include it in his petitions for post-conviction relief. In response, the petitioner asserts he has not waived this issue "because the State's failure to object during the post-conviction hearing prevented [him] from amending [his] post-conviction petition." However, because the post-conviction court addressed this issue in denying relief, we will review the merits of the claim.

The defense offered Christopher Robinson as an expert at trial, and the State questioned Mr. Robinson regarding job-related reprimands he received in an effort to attack his credibility. Trial counsel explained she did not object to the State's impeachment efforts because she believed "the State had a right to ask him about those issues . . . because it was relevant to his credibility." The post-conviction court agreed,

noting "the State's impeachment of Mr. Robinson here was entirely permissible." The post-conviction court determined "because [the petitioner] has failed to show that the State's questions were objectionable, he has also failed to show that [t]rial [c]ounsel rendered deficient performance in not raising objections." We agree with the post-conviction court. Nothing in the record indicates trial counsel rendered deficient performance in this regard. *Goad*, 938 S.W.2d at 369. Furthermore, we note that the petitioner failed to present an expert during the post-conviction hearing in order to show there was another more "credible" expert available to trial counsel. Thus, the petitioner cannot establish prejudice. *See Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990) ("When a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing."). The petitioner is not entitled to relief.

### *Conclusion*

Based upon the foregoing authorities and reasoning, the judgment of the post-conviction court is affirmed.

_____
J. ROSS DYER, JUDGE